<u>NO. 11-2028</u>

**IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT**

**MAGDELENE LUCERO**,

      **Plaintiff-Appellant,**

vs.

**SANDIA CORPORATION, d/b/a SANDIA
NATIONAL LABORATORIES,**

      **Defendant-Appellee.**

On Appeal from the United States District Court
for the District of New Mexico,
The Honorable Judith C. Herrera, United States District Judge,

---

**CORRECTED
PLAINTIFF'S/APPELLANT'S OPENING BRIEF
FILED UNDER SEAL (PROVISIONAL)**

---

KELEHER & McLEOD, P.A.
Jeffrey A. Dahl
Javier F. Junco
P.O. Box AA
Albuquerque, NM  87103
(505) 346-4646
*Attorneys for Plaintiff/Appellant*

**STATEMENT REGARDING ORAL ARGUMENT:**
APPELLANT RESPECTFULLY REQUESTS ORAL ARGUMENT

(Attachments are in scanned PDF format)

# **TABLE OF CONTENTS**

Page

JURISDICTIONAL STATEMENT.......................................................... 1

ISSUES PRESENTED............................................................................. 1

STATEMENT OF THE CASE................................................................. 2

    A.    Nature of the Case................................................................. 2

    B.    Course of Proceedings........................................................... 3

STATEMENT OF FACTS RELEVANT
TO ISSUES SUBMITTED FOR REVIEW............................................. 4

    A.    Background............................................................................ 4

    B.    The "'VOC'" ratings had a determinative impact on salaries,
        and Appellant's ratings (and thus her salaries) were negatively
        impacted by Mr. Sandoval's ratings of her work............................... 5

    C.    Discriminatory treatment in pay raises on the basis of
        age and national origin during the time Mr. Sandoval
        was Appellant's manager.................................................... 6

    D.    Mr. Sandoval's explanation for this difference
        in raises is pretextual.......................................................... 7

    E.    Due to her 2008 reassignment, Appellant ended up with
        significantly lesser responsibilities & leadership duties,
        and this reduction was the result of Mr. Sandoval's
        recommendation.................................................................. 10

SUMMARY OF ARGUMENT................................................................ 11

i

<u>Page</u>

I.  THE COURT ERRED WHEN IT DETERMINED THAT
    THERE WAS NOT A PRIMA FACIE CASE OF AGE AND
    NATIONAL ORIGIN DISCRIMINATION ON THE BASIS
    OF LESSER RAISES THAN THOSE OF SIMILARLY
    SITUATED EMPLOYEES OF NON-PROTECTED CLASSES ............... 14

    A.   The Court erred by concluding that Sandia's express
         admission was insufficient to establish which Sandia
         employees were similarly situated to Appellant ................................ 15

    B.   The Court erred when it ignored the case law establishing
         That smaller raises than those of other similarly situated
         Employees outside the protected class are adverse employment
         actions, and when it addressed this issue as a factual (rather
         than a legal) question .......................................................................... 19

    C.   The Court erred when it ignored the case law establishing
         that Appellant suffered an adverse employment action
         when she was precluded from eligibility for advancement
         for three years ...................................................................................... 23

    D.   The Court erred when it did not examine the evidence
         and all reasonable inferences there from in the light most
         favorable to the nonmoving party when it determined
         that Appellant was not treated less favorably than those
         similarly situated employees in the non-protected classes ................ 25

         1.   Appellant received lesser pay increases than those
              of her younger peers .................................................................. 25

         2.   Appellant received lesser pay increases than those
              of her Anglo peers ...................................................................... 28

Page

II.   THE COURT ERRED WHEN IT DETERMINED THAT
      SANDIA'S REASONS FOR APPELLANT RECEIVING
      LESSER RAISES THAN SIMILARLY SITUATED
      YOUNGER AND NON-HISPANIC EMPLOYEES WERE
      NOT PRETEXTUAL.................................................................. 32

      A.    The Court erred when it ignored evidence from which a
            reasonable jury could conclude that the "value of contribution"
            ratings given by Mr. Sandoval were determinative in
            establishing the salaries of Appellant and her peers......................... 32

      B.    The Court erred when it failed to examine evidence of age
            and national origin bias by Mr. Sandoval and all reasonable
            inferences therefrom in the light most favorable to the
            nonmoving party................................................................. 35

III.  THE COURT ERRED WHEN IT DETERMINED THAT
      SANDIA'S REASON FOR APPELLANT'S DUTIES BEING
      SIGNIFICANTLY REDUCED IN 2008 WAS NOT
      PRETEXTUAL .............................................................. 44

      A.    The Court erred when it held that Sandoval's remarks
            that "the only work that Appellant did was VTR codes"
            was hearsay in disregard of Rule of Evidence 801(d)(2)(D)........... 47

CONCLUSION.................................................................... 51

REASONS FOR ORAL ARGUMENT.............................................. 51

CERTIFICATE OF COMPLIANCE.................................................. 53

CERTIFICATE OF DIGITAL SUBMISSION....................................... 54

CERTIFICATE OF SERVICE....................................................... 55

STATEMENT OF PRIOR OR RELATED APPEALS:
There are no appeals prior or related to No. 11-2028.

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### <u>10th CIRCUIT CASES</u>

<u>Amro v. The Boeing Co.</u>,
     232 F.3d 790 (10th Cir. 2000) ......................................................20, 21, 22, 29

<u>Abuan v. Level 3 Communs, Inc.</u>,
     353 F.3d 1158 (10th Cir. 2003) .......................................................................49

<u>Byers v. City of Alb.</u>,
     150 F.3d 1271 (10th Cir. 1998) .........................................25, 29, 30, 31, 35, 37

<u>Fester v. Farmer Bros. Co.</u>,
     49 Fed. Appx. 785 (l0th Cir. 2002) .................................................................48

<u>Fischer v. Forestwood Co.</u>,
     525 F.3d 972 (l0th Cir. 2008)............................................................................48

<u>Hulen v. Yates</u>,
     322 F.3d 1229 (10th Cir. 2003) ...................................................................14

<u>Johnson v. Weld County</u>,
     594 F.3d 1202 (l0th Cir. 2010)...........................................................48, 49, 50

<u>Jaramillo v. Colo. Judicial Dep't</u>,
     427 F.3d 1303 (l0th Cir. 2005)...........................................................48, 49, 50

<u>Kutz v. Lamm</u>,
     708 F.2d 537 (10th Cir. 1983) .......................................................................15

<u>Pedroza v. Lomas Auto Mall</u>,
     716 F. Supp. 2d 1031 (D.N.M. 2010).........................................15, 16, 18, 19

<u>Rainbow Travel Service v. Hilton Hotels Corp.</u>,
     896 F.2d 1233 (10th Cir. 1990) .....................................................................48

Somoza v. University of Denver,
    2006 U.S. Dist. LEXIS 62394, (D. Colo. 2006),
    *affirmed by* Somoza v. U. of Denver, 2008 U.S. App.
    LEXIS 1170 (10th Cir. 2008) ..................................................................20, 22

Taher v. Wichita State University,
    526 F. Supp. #2d 1203 (D. Kan. 2007).........................................20, 21, 22, 29

U.S. v. Mason,
    85 F.3d 471 (10th Cir. 1996) ...........................................................................16

U.S. v. Whittaker,
    Fed. App'x. 772 (10th Cir. 2003) ....................................................................16

## CASES FROM OTHER JURISDICTIONS

Andrezyski v. Kmart Corp.,
    358 F. Supp. 2d 511 (W.D. Va. 2005) ......................................................17, 19

Anderson v. Liberty,
    477 U.S. 242 (1986).........................................25, 29, 30, 31, 35, 37

Crawford v. Carroll,
    529 F.3d 961 (11th Cir. 2008) .........................................................................20

Epstein v. Kalvin-Miller Int'l, Inc.,
    121 F. Supp. 2d 742 (S.D.N.Y. 2000) ......................................................17, 19

Gillis v. Georgia Corrections Dept.,
    400 F.3d 883 (11th Cir. 2005) ...................................................................23, 24

Knox v. Indiana,
    93 F.3d 1327 (7th Cir. 1996) ...........................................................................39

Maclin v. SBC Ameritech,
    520 F.3d 781 (7th Cir. 2008) .....................................................................23, 24

McIntyre v. Longwood Central School District,
    658 F.Supp.2d 400 (E.D.N.Y 2009) ............................................................20

O'Connor v. Consolidated Coin Caterers Corp.,
    517 U.S. 308 (1996)......................................................................................26

Pimentel v. City of New York,
    2002 U.S. Dist. LEXIS 8454 (S.D.N.Y. 2002)............................................23

Ray v. Henderson,
    217 F.3d 1234 (9th Cir. 2000) ......................................................................23

Snyders v. Hale,
    89 N.M. 734, 557 P.2d 583, (Ct. App. 1976) ..............................15, 16, 18, 19

Thomas v. TPI Staffing, Inc.,
    2005 U.S. Dist. LEXIS 20027 (S.D. Tex. June 29, 2005) ....................17, 19

## STATUTES AND RULES

29 U.S.C. § 621, *et seq.*..................................................................................3

42 U.S.C. §§ 1981, 2000e *et seq.* ..................................................................3

Fed. R. Evid. 801(d)(2)(D)........................................................2, 14, 47, 48, 49, 50

## OTHER AUTHORITIES

Pub. L. No. 111-2, 123 Stat. 5 (2009) ..........................................................3

## JURISDICTIONAL STATEMENT

Appellant Magdelene Lucero ("Appellant") filed a notice of appeal on January 31, 2011 [Doc. 100], seeking review of the District Court's Memorandum Opinion and Order ("Order") [Doc. 96], filed on January 3, 2011, which granted Appellee Sandia Corporation's ("Sandia's" or "Appellee Sandia's") Motion for Summary Judgment [Doc. 73]. [*App.* at 9-10, 272-88]. The Court's Order dismissed all remaining claims brought forth by Appellant, and thus constitutes a final order from which an appeal may be brought to this Court. [*App.* at 272].

## ISSUES PRESENTED

A.    Did the Court err by concluding that Sandia's express admission was insufficient to establish which Sandia employees were similarly situated to Appellant?

B.    Did the Court err when it concluded that smaller raises than those of other similarly situated employees outside the protected class are not adverse employment actions, and when it addressed this issue as a factual (rather than a legal) question?

C.    Did the Court err when it ignored case law establishing that   Appellant suffered an adverse employment action when she was precluded from eligibility for advancement for three years?

D.    Did the Court err when it determined that Appellant was not treated less favorably than those similarly situated employees in the non-protected classes without

1

examining the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party?

E.     Did the Court err when it ignored evidence from which a reasonable jury could conclude that the "value of contribution" ratings given my Mr. Sandoval were determinative in establishing the salaries of Appellant and her peers?

F.     Did the Court err when it failed to examine evidence of age and national origin bias by Mr. Sandoval and all reasonable inferences therefrom in the light most favorable to the nonmoving party?

G.     Did the Court err when it held that Sandoval's remarks that "the only work that Appellant did was VTR codes" was hearsay in disregard of Rule of Evidence 801(d)(2)(D)?

## **<u>STATEMENT OF THE CASE</u>**

A.     <u>Nature of the Case</u>.

The lawsuit below resulted from discriminatory and retaliatory treatment in the terms and conditions of Appellant's employment with Appellee Sandia. [*App.* at 11-17].  In particular, Appellant brought claims of discrimination on the basis of her age (60) under the Age Discrimination in Employment Act ("ADEA"), and also on the basis of her national origin (Hispanic) under Title VII. [*Id.*].

Originally, Appellant also claimed that Sandia violated her First Amendment rights when it retaliated against her after she reported certain security violations, but

Appellant has since withdrawn that claim. [*App.* at 11-17, 136]. Also, Appellant had brought a claim under the Ledbetter Pay Act as a separate count and a claim of Intentional Infliction of Employment Distress ("IIED"), but those claims were dismissed by the District Court. [*App.* at 8, 11-17, 136]. Thus, Appellant's First Amendment and IIED claims, as well as the Ledbetter Act claim brought as a separate count, are not a part of this Appeal. [*Id.*]. This Appeal contends that the Court engaged in error when it dismissed via summary judgment Appellant's claims of age discrimination under the ADEA, and of national origin discrimination under Title VII. [*App.* at 272-87].

      B.    <u>Course of Proceedings</u>.

Appellant sued Sandia on September 24, 2009 [Doc. 3], alleging claims under the ADEA, 29 U.S.C. § 621, *et seq.* (Count I), under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981 (Count II), under the Lilly Ledbetter Fair Pact Act of 2009, Public Law 111-2, 123 Stat. 5 (2009), (Count III), of IIED (Count IV), and of violation of First Amendment rights and retaliation (Count V). [*App.* at 11-17].

On October 27, 2009, Sandia filed a Motion to Dismiss Counts III-V [Doc. 10]. [*App.* at 3]. On July 12, 2010 (prior to the Court's resolution of Sandia's Motion to Dismiss Counts III-V) Sandia filed a Motion for Summary Judgment on all counts [Doc. 73]. [*App.* at 8, 34-121]. On August 5, 2010, the Court granted in part Sandia's Motion to Dismiss and thereby dismissed Counts III and IV [Doc. 77]. [*App.* at 8, 136].

On August 23, 2010, Appellant responded to Sandia's Motion for Summary Judgment [Doc. 82]. [*App.* at 8, 136-93]. In her Response to Sandia's Motion for Summary Judgment, Appellant withdrew her claim of violation of First Amendment rights and retaliation (Count V), and responded instead to Sandia's requested dismissal of the age and national origin discrimination claims (Counts I and II). [*App.* at 136-93]. In her Response, Appellant noted however, that she contended that her claim for relief under the Ledbetter Pay Act (originally contained separately in Count III) was subsumed into, and a part of, her Count I and II discrimination claims. [*App.* at 136]. On September 14, 2010, Sandia filed its Reply in Support of Motion for Summary Judgment [Doc. 84]. [*App.* at 194-245].

The District Court conducted no hearing on Sandia's Motion for Summary Judgment, and on January 3, 2011 it issued an Order whereby it granted said motion. [*App.* at 9, 272-88]. The Order disposed of all of the remaining claims in the case, thereby dismissing Appellant's age and national origin discrimination claims (Counts I and II). [*App.* at 272-88]. This is an appeal from that Order. [*App.* at 272-88].

## STATEMENT OF FACTS
## RELEVANT TO ISSUES SUBMITTED FOR REVIEW

A.    Background.

Appellant was born in June of 1950 and is 60 years old. [*App.* at 273]. After graduating from high school in the late 1960s, Appellant went to work for Appellee

4

Sandia as a secretarial trainee. [*Id.*]. She rose through the ranks and after many years of work became a Member of Technical Staff ("MTS"). [*Id.*]. At all relevant times, Appellant worked in the Safeguards and Security center ("S&S"), which was reorganized in June, 2008. [*Id.*].

      B.    <u>The "VOC" ratings had a determinative impact on salaries, and Appellant's ratings (and thus her salaries) were negatively impacted by Mr. Sandoval's ratings of her work</u>.

Joe Sandoval worked with Appellant in a managerial capacity from September, 2003 through June, 2008. As Appellant's manager, Sandoval had the exclusive responsibility of establishing Appellant's "value of contribution" ("VOC") rating. [*App.* at 137; 160; 161; 169].

In every single year from 2003 through 2008, the person that had the highest percentage raise also received, <u>without exception</u>, an OC, the highest "VOC" rating within the MTS group. [*App. contents filed under seal* at 7-12; <u>and</u> *App.* at 169].

Mr. Sandoval did the "value of contribution" rating for Appellant for the years of 2004, 2005, 2006, and 2007. [*App.* at 137; 163].

Mr. Sandoval rated Appellant as an Outstanding Contributor "OC" in 2004, but as a Full Contributor in 2005, 2006, and 2007. Appellant's raises since she joined MTS in 2000 but <u>before Mr. Sandoval became her manager</u> were: 4.27% in 2000; 5.00% in 2001; 5.19% in 2002; 2.61% in 2003. [*App.* at 137; 163; 169; 175-176 *and* 177-181].

5

Appellant's raises <u>during the Sandoval era</u> were as follows: 2.5% in 2004; down to 1.6% in 2005; to 1.3% in 2006; and then slightly back up to 2.0% in 2007. Only after Mr. Sandoval ceased to be her manager did Appellant's raise bounce back to 6.2% in 2008. [*App.* at 138; 163; 177-181; <u>and</u> *App. contents filed under seal* at 7-12].

Appellant's lesser pay increases resulted in her dropping from 103% of the average of her peers in 2005 to 99% of the average of the same in 2006. This drop below the 100% midpoint precluded her from being promoted for the next three years, from 2006 through and including 2008. Per Sandia policy, if an employee's salary is dropped below midpoint that employee may not be promoted. [*App.* at 138; 175-176; 177-181].

C.    <u>Discriminatory treatment in pay raises on the basis of age and national origin during the time Mr. Sandoval was Appellant's manager.</u>

From 2004 through 2007, Appellant's average pay increase amounted to only 61% of the average increases offered to similarly situated under-50 employees. [*App. contents filed under seal* at 7-12; <u>and</u> *App.* at 138; 182-183].

From 2003 to 2008, Appellant received only 70% of the average pay increase that her under-50 counterparts received over the six-year period. [*Id.*]

From 2003 through 2008, the 50-and-over employees in the group received only 70% of the average pay increase given to their under-50 counterparts over the same period. [*Id.*]

Appellant's average raise for the periods 2003-2008 was 80% of the average raise received by her peers under 40, and that same number was 85% for the period 2004-2007. [*Id.*]

From 2004 through 2007, Appellant's average pay increase amounted to 61% of the average increases offered to similarly situated Anglo employees, and that same number was 74% for the period 2003-2008. From 2003 through 2008, Hispanic employees in the group received 77% of the average pay increase given to their Anglo counterparts over the same period. [*Id.*].

The recipient of the highest raises in Appellant's MTS peer group was an Anglo in 5 of the 6 years. Said recipients were, on average, 45.7 years old, while during the same period Appellant was, on average, 55.7 years old. [*App. contents filed under seal at 7-12*].

D.    <u>Mr. Sandoval's explanation for this difference in raises is pretextual</u>.

Mr. Sandoval explained that he dropped Appellant's rating (and thus her raises) because "[h]er peers' work exceeded [Appellant's] work greatly." Mr. Sandoval's explanation for why her raise bumped back up when he ceased to be her manager was: "I have no clue. Maybe market reference went up." [*App.* at 139; 164; 165].

Some time in 2003 or 2004, Mr. Sandoval took out a list at a department meeting and started to state the names of certain MTS employees that were eligible to retire. Included in the names stated by Mr. Sandoval was that of Appellant. Appellant

7

told Mr. Sandoval at the meeting that she wanted her name off the list. Mr. Sandoval testified that "each year" he would do that because managers were asked by the higher-ups to talk to people about when they planned to retire. [*App.* at 138; 139; 167; 190].

Mr. Sandoval would frequently ask Nancy Morreale (one of his project leads) when Appellant was going to retire. [*App.* 139; 192].

In August, 2004, a few months after Mr. Sandoval became her manager, Appellant and another Hispanic (Larry Chavez) were suddenly removed from their Human Reliability Program ("HRP") duties. Mr. Sandoval told Appellant at the time that her job duties had changed. As a result of said action, Appellant was removed from the HRP database, which in turn prevented her from having that resource in order to do her job. [*App.* at 139; 187; 188].

Starting in 2005, Appellant was not given new assignments from Mr. Sandoval and he limited the tools she needed to do her work. [*App.* at 139; 185; 191].

Around 2005 or 2006, Mr. Sandoval stated, in the presence of Karen Sienkewich, and of Appellant, that "I was in 2nd grade when Maggie came to work here." [*App.* at 140; 169].

Mr. Sandoval was told by Appellant that she was interviewing for a manager's position in 2008, to which Sandoval responded: "What do you want us to do, bake cookies?" Mr. Sandoval, who is half-German, and who was 42 years old at the time, tried to rotate Appellant out of the S&S Dept. Mr. Sandoval also told Martin Carrasco,

a Hispanic staff augmentation contractor who had a degree, that he could not get hired as a Sandian. By way of contrast, during the Sandoval era, two Anglos who had no degrees and who had been staff aug. contractors, were hired as Sandians. [*App.* at 140; 169; 188; 191; 193].

Mr. Sandoval testified that Appellant "performed capably," was "a very hard worker, a very good producer," and that she "helped make the team successful." But, around 2005, he would come into Appellant's office, telling her that "so-and-so couldn't work with [her], and then he'd come the next day and he'd say, well, so-and-so thinks that you're mad at them." Mr. Sandoval moved Appellant to an office where she "had no desk, no file cabinet,...no...red drop to be able to do classified work and...no...Entrust, which allows [one] to send e-mails to the site office outside Sandia." [*App.* at 140; 166; 186].

Under Sandoval's management (2004-2007), on average, 50 and over employees received 67% of the average total pay increases enjoyed by similarly situated employees under 50, and Hispanic employees received, on average, 69% of the average total pay increases enjoyed by similarly situated Anglo employees. [*App. contents filed under seal* at 7-12; <u>and</u> *App.* at 182-183].

9

E.    Due to her 2008 reassignment, Appellant ended up with significantly lesser responsibilities and leadership duties, and this reduction was the result of Mr. Sandoval's recommendation.

Prior to her reassignment in 2008, Appellant had seven program areas as part of her job responsibilities, which included 29 different responsibilities and/or duties. [*App.* at 140; 169].

After her reassignment, Appellant maintained only one program area (the Vault Type Rooms ("VTR") Program), which included only six duties, which involved a 79% loss of her responsibilities and/or duties. [*App.* at 141, 170].

Prior to the reassignment, Appellant headed and streamlined the efforts of six employees.  After her reassignment she had only person under her, which involved an 83% loss in the amount of employees that were under her leadership. [*App.* at 141; 171].

After Appellant's reassignment, several of her prior responsibilities, such as locking key responsibilities, Security System Request ("SSR") and Temporary Limited Area ("TLAs") responsibilities, were entrusted to Tom Rodgers in an increased capacity.  Mr. Rodgers is an Anglo employee who had previously been a staff augmentation non-Sandian contractor. [*App.* at 141; 189].

Appellant saw the Minutes from the reorganization which indicated that Joe Sandoval stated (as part of their decision-making process on where to place Appellant)

10

that the only work that Appellant did was VTR codes.  Appellant told Scott Ashbaugh that Mr. Sandoval had sold her short, and Mr. Ashbaugh responded to her that he would not deny that Mr. Sandoval did.[1] [*App.* at 141, 171].

After the reassignment, and after Appellant inquired why she had been reassigned, Appellant was offered the opportunity to work under Tony Aragon in what appeared to be <u>some</u> of her prior "physical security" duties.  This  offering did not involve a return to her prior position because her prior position included a total of 7 programs, including VTR, while the Aragon offering required her to leave her VTR responsibilities behind.  Appellant asked what the Aragon offering involved, and outside of being told that it involved "'physical security'" work, Appellant was never informed whether it included returning to the remaining 6 programs, except VTR, that she had been previously working on.  The Aragon offering did not include a return to a substantial portion (six out of seven) of the programs that she had worked on prior to the reassignment.  Since neither option provided Appellant the actual seven-program position that she had prior to the reassignment, she decided not to take that offering, and stayed at VTR.  [*App.* at 142; 171].

## **SUMMARY OF ARGUMENT**

The District Court erred when it determined that Appellant had failed to establish a *prima facie* case of age and national origin discrimination on the basis of

---

[1] Appellant was <u>never disciplined</u> in her 42 years at Sandia.  [*App.* at 141, 171].

smaller raises than those received by similarly situated employees of non-protected classes. Specifically, the Court first erred by concluding that Sandia's express admission, that the Members of Technical Staff ("MTSs") were Sandia employees that were "similarly situated" to Appellant, was insufficient to establish that the MTSs were "similarly situated" to Appellant.

Second, the Court erred when it ignored considerable case law establishing that smaller raises than those received by other similarly situated employees outside the protected class are adverse employment actions, and by addressing such issue as a factual (rather than a legal) question.

Third, the Court erred when it ignored the case law establishing that Appellant suffered an adverse employment action when she was precluded from eligibility for advancement for three years.

Fourth, the Court error when it did not examine the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party when it determined that Appellant was not treated less favorably than those similarly situated employees in the non-protected classes. Such evidence involved data that, during the entire relevant period of 2003-2008, Appellant received lesser pay increases than those of her younger peers, and than those of her Anglo peers. Instead, the Court erroneously cherry-picked particular data for certain years and thus, did not examine the evidence in the light most favorable to the non-movant.

Additionally, the Court twice erred when it determined that Sandia's reasons for Appellant receiving lesser raises than those received by similarly situated younger and non-Hispanic employees were not pretextual.   The Court first erred when it ignored evidence from which a reasonable jury could conclude that the "value of contribution" ratings given by Mr. Sandoval (a person with age and national origin-based biases) were determinative in establishing the salaries of Appellant and her peers.  The Court also erred when it failed to examine evidence of age and national origin bias by Mr. Sandoval and all reasonable inferences therefrom in the light most favorable to the nonmoving party.

Furthermore, the Court erred when it determined that Sandia's reason for Appellant's duties and responsibilities being significantly reduced in 2008 was not pretextual. The reason offered by Sandia for the decision to reassign Sandia to the VTR program in 2008 was that VTR was the "crown jewel" of physical security, and that Mr. Sandoval felt that Lucero's knowledge of VTRs made her a key leader in the VTR program. [*App.* at 284-85].  But the evidence supports an alternative explanation, namely, that Appellant's duties were exclusively reduced to VTR because Mr. Sandoval stated (as part of their decision-making process on where to place Appellant) that the only work that Appellant did was VTR codes. [*App.* at 141, 156, 171].  The Court erred when it held that the evidence regarding Sandoval's remarks that "the only

work that Appellant did was VTR codes" was hearsay under Fedreal Rule of Evidence

801(d)(2)(D).

## ARGUMENT

*STANDARD OF REVIEW:*  This court reviews the denial of a summary judgment

motion *de novo*.  Hulen v. Yates, 322 F.3d 1229, 1236 (10th Cir. 2003). *STATEMENT*

*OF PRESERVATION:*   Appellant preserved the issues raised in this appeal by

responding to Sandia's Motion for Summary Judgment. [*App.* at 136-93].

## I.

### THE COURT ERRED WHEN IT DETERMINED THAT THERE WAS NOT A PRIMA FACIE CASE OF AGE AND NATIONL ORIGIN DISCRIMINATION ON THE BASIS OF LESSER RAISES THAN THOSE OF SIMILARLY SITUATED EMPLOYEES OF NON-PROTECTED CLASSES.

In its Memorandum Opinion and Order [Doc. 96], the District Court correctly

noted that there was no dispute that (as required to establish two of the elements of

*prima facie* discrimination) Appellant was a member of two protected classes (over 40

and Hispanic), and that she was qualified for the position she held. [*App.* at 277].  The

Court concluded however that two other *prima facie* elements were not established,

i.e.: (A) that Appellant was treated less favorably than similarly situated employees

that were not in the protected class, and (B) that her raises amounted to adverse

employment action. [*App.* at 277-280].  As discussed below, the Court engaged in

several errors in reaching these conclusions.

14

A.    The Court erred by concluding that Sandia's express admission was insufficient to establish which Sandia employees were similarly situated to Appellant.

In the Order [Doc. 96], the Court concluded that Appellant had submitted no evidence to establish which other MTSs outside the protected class were similarly situated to Appellant. [*App.* at 278-79.  However, in so doing the Court ignored that Sandia expressly identified the MTSs as those that "'were similarly situated to herself'" or her "peers," and thus agreed with Appellant that the MTSs were similarly situated to her. [*App.* at 38, 44-45].

The Tenth Circuit has consistently held that "'we cannot overlook or disregard stipulations which are absolute and unequivocal,'" and that "[s]tipulations of attorneys may not be disregarded or set aside at will.'" Kutz v. Lamm, 708 F.2d 537, 539 (10th Cir. 1983) (quoting United States v. Northern Colorado Water Conservancy District, 608 F.2d 422 , 431 (10th Cir. 1979)).  This Court has further stated that it is "reluctant to relieve parties from the benefits, or detriments, of their stipulations." Lamm, 708 F.2d at 539-40.  Similarly, the District Court for the District of New Mexico has recently noted that "admissions are binding on a party under both New Mexico and federal law." Pedroza v. Lomas Auto Mall, 716 F.Supp. 2d 1031, 1044 (D.N.M. 2010).

Indeed, "statements or admissions made by an attorney…for the purpose of dispensing with certain testimony or proof of a certain fact or facts are binding on his client." Snyders v. Hale, 89 N.M. 734, 735, 557 P.2d 583, 584 (Ct. App. 1976).

Accordingly, "[a] defendant is bound by the admissions of its attorney and the same are an adequate substitute for evidence." <u>Pedroza</u>, 716 F. Supp. 2d at 1044 (quoting <u>Snyders</u>, 89 N.M. at 736, 557 P.2d at 585). For instance, when "defendants concede[] liability," the Appellants are relieved from their burden of proof with respect to that which is covered by the admission. <u>Snyders</u>, 89 N.M. at 736, 557 P.2d at 585.

Therefore, "[f]indings are not required with respect to facts which have been agreed upon by stipulation." <u>Id.</u> (citing <u>People v. Marsicano</u>, 135 P.2d 16 (Cal. 1943); <u>State v. Brown</u>, 201 A.2d 852 (Md. 1964), *cert. denied*, 379 U.S. 978, 85 S.Ct. 680, 13 L.Ed.2d 568 (1965); <u>State Tax Commission v. Murray Co. of Texas, Inc.</u>, 350 P.2d 674 (Ariz. 1960), *cert. granted and case remanded*, 364 U.S. 289, 81 S.Ct. 53, 5 L.Ed.2d 39 (1960); 358 P.2d 167 (Ariz. 1960); *cert. denied*, 366 U.S. 950, 81 S.Ct. 1903, 6 L.Ed.2d 1243 (1961).

As noted by the Tenth Circuit, "[t]he jury need not resolve the existence of an element when the parties have stipulated to the facts which establish that element." <u>U.S. v. Mason</u>, 85 F.3d 471, 472 (10th Cir. 1996). Under such circumstances, "the judge has not removed the consideration of an issue from the jury; the parties have." <u>Id.</u> "More specifically, by stipulating to elemental facts, a defendant waives his right to a jury trial on that element." <u>Id.</u>; <u>see also</u> <u>U.S. v. Whittaker</u>, 72 Fed. Appx. 772 (10th Cir. 2003); 2003 *U.S. App. LEXIS* 14727 (10th Cir.).

Additionally, in Epstein v. Kalvin-Miller Int'l, Inc., 121 F. Supp. 2d 742, 745 (S.D.N.Y. 2000) (emphasis added), the Court held that because the parties in that case had "stipulated that due to [the Appellant's] heart condition and diabetes, Appellant was disabled under the NYHRL at the time that he was fired, any further evidence of…medical condition to prove the disability element of Appellant's prima facie case would be a 'needless presentation of cumulative evidence'" under Rule 403.

Further, in the employment discrimination context courts have held similarly. For instance, Andrezyski v. Kmart Corp., 358 F. Supp. 2d 511, 514-515 (W.D. Va. 2005), involved a case of age discrimination under the ADEA and sex discrimination under Title VII. In Andrezyski, the parties "stipulated the first three elements of the *prima facie* case, [that] Andrezywski [was] female,… was fifty-three at the time of the reduction in force ("RIF"), [that] her reduction to part-time status was an adverse employment action, and she was performing at a level that met K-mart's legitimate expectations." 358 F. Supp. 2d at 514. Thus, the Court concluded that "[t]he issue before me is whether [the Appellant] ha[d] presented evidence sufficient to raise a genuine issue of material fact as to the fourth element." Id. at 514-15. Similarly, in Thomas v. TPI Staffing, Inc., 2005 U.S. Dist. LEXIS 20027, *9 (S.D. Tex. June 29, 2005), the defendant stipulated that the Appellant was "a member of a protected class, was qualified for his job, and was subject to an adverse employment action."

17

Therefore, the Court held that the Appellant had "establishe[d] the first three elements of a *prima facie* case for a Title VII discrimination claim." Id.

As in the above case law, Appellee Sandia here is "bound by the admissions of its attorney and the same are an adequate substitute for evidence." Pedroza, 716 F. Supp. 2d at 1044 (quoting Snyders, 89 N.M. at 736, 557 P.2d at 585.  In particular, counsel for Sandia admitted in its Motion for Summary Judgment who were the employees that were "similarly situated" to Appellant. [*App.* at 37 (UMF 9), 44-45; *App. for Contents Filed Under Seal*, at 4-5, 7-12].

Sandia's counsel stated that "Appellant cannot establish that she was treated less favorably than younger or non-Hispanic Sandians who were similarly situated to herself, another element of her prima facie case." [*App.* at 44]. Sandia then proceeded to rely on the comparison table referenced in its UMF 9 and contained in Exhibit 1 to Melissa Creange's Declaration (Ex. O to the Motion) to establish that the MTSs in years 2003-2008 were the employees that were "similarly situated" to Appellant, and that Appellant was not treated less favorably than them. [*App.* at 37 (UMF 9), 44-45; *App. for Contents Filed Under Seal*, at 4-5, 7-12].

Therefore, it was error as a matter of law for the District Court to "relieve [Sandia] from the…detriments" of their admission, to which Appellant stipulated when it relied on that very group of "similarly situated" employees to show why Appellant was indeed treated less favorably. Lamm, 708 F.2d at 539-40; *see App.* at 144-47, 149

(*fn* 7).  Contrary to the District Court's determination, in light of Sandia's express admission and Appellant's agreement concerning which employees were "similarly situated," Appellant did not have to prove said element because Sandia's admission was "an adequate substitute for evidence." Pedroza, 716 F. Supp. 2d at 1044 (quoting Snyders, 89 N.M. at 736, 557 P.2d at 585); see also Epstein, 121 F. Supp. 2d at 745 (after parties stipulated that Appellant was disabled any further evidence of medical condition to prove disability element of Appellant's *prima facie* case would be a needless presentation of cumulative evidence); Thomas, 2005 U.S. Dist. LEXIS 20027, at *9 (when defendant stipulates that Appellant is a member of a protected class, was qualified for his job, and was subject to adverse employment action, Appellant has established first three elements of *prima facie* case of discrimination claim); and Andrezyski, 358 F. Supp. 2d at 514-15.

> B.    The Court erred when it ignored the case law establishing that smaller raises than those of other similarly situated employees outside the protected class are adverse employment actions, and when it addressed this issue as a factual (rather than a legal) question.

In the Order [Doc. 96], the Court concluded that Appellant "has failed to meet her *prima facie* burden to show that her raises amounted to an adverse employment action." [*App.* at 279].  The Court's conclusion was erroneous because it was reached on the basis of the Court's weighing of the evidence regarding Appellant's raises and those of her "peers," and not on the basis of any legal authority addressing the legal

question at issue: whether receiving smaller salary increases than other similarly situated employees outside the protected class constitutes an adverse employment action as a matter of law.  [*App.* at 279-80].

The weight of the authority within the Tenth Circuit establishes that the answer to the above legal question is yes.  In particular, the Tenth Circuit has consistently held that receiving smaller salary increases than other similarly situated employees outside the protected class does indeed establish a *prima facie* case of pay discrimination. <u>See Amro v. The Boeing Co.</u>, 232 F.3d 790, 798 (10th Cir. 2000)(a lesser raise than similarly situated non-protected class employees is a valid discrimination claim); <u>Somoza v. University of Denver</u>, 2006 U.S. Dist. LEXIS 62394, *42 (D. Colo. 2006), *affirmed by* <u>Somoza v. U. of Denver</u>, 2008 U.S. App. LEXIS 1170 (10th Cir. Colo. 2008) ("In the Tenth Circuit, an Appellant may be able to show an adverse employment action for purposes of a *prima facie* case under § 1981 if he or she receives a smaller salary increase than other similarly-situated employees outside the protected class."); <u>see also</u> <u>Taher v. Wichita State University</u>, 526 F. Supp.2d 1203, 1218 (D. Kan. 2007).  Additionally, courts in other circuits have held in a similar manner.  <u>Crawford v. Carroll</u>, 529 F.3d 961, 977 (11th Cir. 2008) (allegations concerning the denial of merit pay increase and disparate pay are genuine issues of material fact and preclude summary judgment); <u>McIntyre v. Longwood Central School Dist.</u>, 658 F. Supp 2d 400, 413 (E.D.N.Y. 2009)(Appellant is entitled to argue that he

received a lower pay increase than similarly situated counterparts and thereby satisfied his burden to establish a *prima facie* case with respect to adverse employment action).

In this Circuit, <u>Taher</u> is rather instructive on this point.  In <u>Taher</u>, the Court stated that "[t]o establish a *prima facie* case of pay discrimination, Appellant must show that he was paid less, <u>or given a lesser pay raise</u>, than similarly situated employees of different races." 526 F. Supp.2d at 1218 (emphasis added) (citing <u>Amro</u>, 232 F.3d at 798 (10th Cir. 2000)).

Significantly, in that case the defendant employer argued (as Sandia did below) "that Appellant could not establish a *prima facie* case because…the [employer Wichita State] University increased his pay," and "a salary increase [was] not…adverse action." <u>Taher</u>, 526 F. Supp.2d at 1218.  The <u>Taher</u> Court reasoned however, that "[t]he issue...is not whether Appellant received *any* pay raise <u>but whether he received a lesser raise</u> than similarly situated employees of different races." <u>Id.</u> (relying on the Tenth Circuit's decision in <u>Amro</u>, 232 F.3d at 798).  The Court thus concluded that "Appellant's claim [of pay discrimination was not]…precluded by the mere fact that he received a pay raise." <u>Taher</u>, 526 F. Supp.2d at 1218.

Therefore, the Court's conclusion that "Lucero's [lesser] raises [did not] constitute adverse employment action" is just contrary to Tenth Circuit law. [*App.* at 280].

Furthermore, the issue of whether receiving smaller raises than other similarly situated employees outside the protected class constitutes adverse action is a legal question for the Court which requires a legal analysis. <u>Amro</u>, 232 F.3d at 798; <u>Somoza</u>, 2006 U.S. Dist. LEXIS 62394, at *42; <u>Taher</u>, 526 F. Supp.2d at 1218.  The District Court however did not engage in legal analysis to address this question. [*App.* at 279-80].

Rather, the Court improperly decided to engage in typical jury duty and weigh the evidence in order to determine whether Appellant's raises constituted adverse action.  Specifically, the Court decided that "the evidence shows that in each year from 2003 to 2008, she received a raise that was within the range of raises given to her peers." [*App.* at 279].  Thus, the Court concluded that "[t]he data…hardly supports an inference that any of [Appellant's] raises constituted an adverse employment action." [*App.* at 280].

For all of the above reasons, the Court erred by ignoring the referenced case law establishing that smaller salary increases than other similarly situated employees outside the protected class are adverse employment actions, and by addressing this issue as a factual (rather than a legal) question. [*App.* at 279-80].

C.    <u>The Court erred when it ignored the case law establishing that Appellant suffered an adverse employment action when she was precluded from eligibility for advancement for three years</u>.

Appellant's lower raises resulted in her dropping from 103% of the average of her peers in 2005 to 99% in 2006. [*App.* at 138, 147-48, 168, 175-81]. This drop below the 100% midpoint precluded her from being promoted for the next three years, from 2006 through and including 2008. [*Id.*].  This is so because, per Sandia policy, if an employee's salary is dropped below midpoint that employee may not be promoted. [*Id.*].  This preclusion from promotion constitutes an adverse action as well.

Federal courts have determined that employment actions that affect a material change in an employee's financial and professional opportunities as well as eligibility for further compensation and advancement constitute an adverse action.  <u>See</u> <u>Maclin v. SBC Ameritech</u>, 520 F.3d 781, 790 (7th Cir. 2008) (changes which have "significant or material affect" on Appellant's job or opportunities for advancement constitutes adverse employment action); <u>Ray v. Henderson</u>, 217 F.3d 1234, 1241 (9th Cir. 2000)(employee suffered adverse employment actions when employee was excluded from positions that precluded eligibility for salary increases); <u>Gillis v. Georgia Corrections Dept.</u>, 400 F.3d 883, 887 (11th Cir. 2005)(adverse employment actions include matters that affect tenure and other decisions affecting important terms of employment); <u>see also</u> <u>Pimentel v. City of New York</u>, 2002 U.S. Dist. LEXIS 8454, *8

23

(S.D.N.Y. 2002)("material adverse change" is one that has attendant negative results such as a deprivation resulting in the loss of a readily quantifiable opportunity).

While this Circuit lacks substantive case law on this issue, the above cases should be followed here because they come from circuits that, like the Tenth, "take an expansive view of the type of actions that can be considered adverse employment actions." See Ray, 217 F.3d at 1241 (noting that the First, Seventh, Ninth, **Tenth**, Eleventh and D.C. circuits all "take an expansive view of the type of actions that can be considered adverse employment actions.").

Thus, Appellant's preclusion from promotion for a period of three years as a result of her drop below midpoint salary constitutes further confirmation that her reduced raises resulted in adverse action. Maclin, 520 F.3d at 790; Ray, 217 F.3d at 1241; Gillis, 400 F.3d at 887.

In the Order [Doc. 96], the Court did not address Appellant's contention that her raises dropping from 103% of the average of her peers in 2005 to 99% in 2006 precluded her from being promoted for the next three years, and thus constituted an adverse employment action as well. [*App.* at 278-80]. However, the above-noted case law establishes that Appellant suffered an adverse employment action when she was precluded from eligibility for advancement for three years. Thus, the Court erred when it ignored such authority in determining that Appellant had failed to meet her burden to show adverse action.

D.  The Court erred because it did not examine the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party when it determined that Appellant was not treated less favorably than those similarly situated employees in the non-protected classes.

Summary judgment should be denied if, after examining the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party, the Court finds sufficient evidence for a reasonable jury to issue a verdict in favor of the nonmoving party. Anderson v. Liberty, 477 U.S. 242, 249 (1986); Byers v. City of Alb., 150 F.3d 1271, 1274 (10th Cir. 1998). Here, the evidence was sufficient for a reasonable jury to find that Appellant's pay increases during the relevant period were a fraction of the average pay increases enjoyed by her younger and Anglo peers, particularly if the evidence had been examined and all reasonable inferences therefrom in the light most favorable to the nonmoving party.

1.  Appellant received lesser pay increases than those of her younger peers.

During the years 2004 through 2007, Appellant was under the management of Joseph Sandoval who for those four years was responsible for determining the value of contribution ratings, that in turn determine Appellant's salary raises. [*App.* at 137, 160, 161, 163 168, 169; *App. of Contents Filed Under Seal* at 7-12].

From 2004-2007, Appellant's average pay increase was 1.85%. [*App.* at 182-83; *App. of Contents Filed Under Seal* at 7-12]. By contrast, the average pay increase for

her similarly situated under-50 peers[2] was 3.02%. [*Id.*]. Thus, Appellant's average pay

increase amounted to only 61% of the average increase offered to similarly situated

---

[2]  Appellant's comparison with her under-50 peers (as opposed to a comparison with her under-40 peers) is relevant for the following reasons:

First, in this case in particular, comparisons with those that were under 40 at the time is not as accurate an indicator of salary raises by age because such a comparison would leave out 85% of Appellant's peer group, which is over the age of 40.  For instance, as a matter of example, such a comparison in the year 2005 would mean that Appellant would only be compared against 3 persons out of a total peer group of 15 other employees.  Such an incomplete comparison presents only a partial snap-shot of the relevant contrast between Ms. Lucero and those that were substantially younger than her.  Accordingly, Appellant contends that a comparison (like the one here) between herself (ages 54 through 58 between the years 2004 and 2007) and those who were 49 or under (at least 5 years younger) is a much more relevant comparison of the salary raises by age within her peer group.

Second, in O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308 (1996), the Court validated such comparisons in order to establish discrimination due to an employee's age.  In that case, the Court established that a *prima facie* case for discrimination based upon age is not necessarily precluded when the involved parties are from the same protected class.  To the contrary, the Court reasoned that the fact that one person in the protected class has lost out to another person in the protected class is irrelevant. Id. The essential element to establish age discrimination is whether the discriminated party has lost out because of her age. Id.

Third, in any event, if a comparison is made between Appellant and her peers under 40, that comparison supports a reversal of summary judgment as well.  In particular, Appellant's average raise for the years 2004-2007 was 1.85% while the average raise of those under 40 was 2.15%, which means that Appellant's avg. raise was 85% of the avg. raise received by her peers under 40. [*App.* at 138, 145-46, 182-83; *App. of Contents Filed Under Seal* at 7-12]. Similarly, Appellant's avg. raise for the years 2003-2008 was 2.7% while the average raise of those under 40 was 3.35%, which means that Appellant's avg. raise was 80% of the avg. raise received by her peers under 40. [*App.* at 138, 1446, 182-83; *App. of Contents Filed Under Seal* at 7-12].

under-50 employees. [*App.* at 138, 182-83; *App. of Contents Filed Under Seal* at 7-12].[3]

Further, the record supports a pattern of institutional ageism that strengthens Appellant's discrimination claim.  From 2004 through 2007, 50 and over employees in Appellant's peer group averaged a 2.061% pay increase, while those under 50 averaged a 3.015% increase. [*App.* at 182-83; *App. of Contents Filed Under Seal* at 7-12].  Therefore, on average, 50 and over employees only received 67% of the average total pay increases enjoyed by similarly situated employees under 50s. [*App.* at 140, 182-83; *App. of Contents Filed Under Seal* at 7-12].

Similarly, in the 2003-2008 time period, 50 and over employees in Appellant's peer group averaged a 2.671% pay increase, while the employees under-50 enjoyed an average of 3.815% pay increase. [*App.* at 146, 182-83; *App. of Contents Filed Under Seal* at 7-12].  Thus, the 50 and over employees received only 70% of the average pay increase given to their under-50 counterparts. [*App.* at 138, 146, 182-83; *App. of Contents Filed Under Seal* at 7-12].

---

[3]  Similarly, from 2003 to 2008, Appellant averaged a 2.7% increase in pay. [*App.* at 146, 182-83; *App. of Contents Filed Under Seal* at 7-12].  The under-50 peers averaged a 3.82% increase. [*Id.*].  Thus, Appellant received only 70% of the average pay increase than her under-50 counterparts received over that 6-year period. [*App.* at 138, 146, 182-83; *App. of Contents Filed Under Seal* at 7-12].

Further, the recipients of the highest raises in the MTS peer group were, on average, 45.7 years old, while during the same period Appellant was, on average, 55.7 years old, a whole decade older than those getting the best raises. [*App.* at 139, 146; *App. of Contents Filed Under Seal* at 7-12].

2.    <u>Appellant received lesser pay increases than those of her Anglo peers</u>.

From 2004 through 2007, Appellant's average pay increase was 1.85%, while the average increase for her Anglo peers was 2.994%. [*App.* at 146, 182-83; *App. of Contents Filed Under Seal* at 7-12].  Thus, Appellant's average raise amounted to 61% of the average received by Anglos. [*App.* at 138, 146, 182-83; *App. of Contents Filed Under Seal* at 7-12].[4]

In the 2004-2007 period, Hispanics in the group averaged a 2.059% increase, while Anglos averaged 2.996%. [*App.* at 146, 182-83; *App. of Contents Filed Under Seal* at 7-12].  Thus, on average, Hispanics only received 69% of the average increases enjoyed by their Anglo peers. [*App.* at 140, 146, 182-83; *App. of Contents Filed Under Seal* at 7-12].

Similarly, in the 2003-2008 time period, Hispanic employees in Appellant's peer group averaged a 2.8015% pay increase, while the Anglo employees enjoyed an

---

[4]  From 2003 to 2008, Appellant averaged a 2.7% increase, while Anglos averaged 3.62%. [*App.* at 146, 182-83; *App. of Contents Filed Under Seal* at 7-12].  Appellant

28

average of 3.6248% pay increase. [*App.* at 147, 182-83; *App. of Contents Filed Under Seal* at 7-12]. Accordingly, the Hispanics in the group received 77% of the average increase given to their Anglo peers over the same period. [*App.* at 138, 147, 182-83; *App. of Contents Filed Under Seal* at 7-12].

Further, the recipients of the highest raises in the MTS peer group during the 2003-2008 period were Anglo in 5 of the 6 years. [*App.* at 139, 147; *App. of Contents Filed Under Seal* at 7-12].

Accordingly, the record shows "that [Appellant] was <u>given lesser pay raise[s]</u> than similarly situated employees." <u>Taher</u>, 526 F. Supp.2d at 1218 (emphasis added); <u>Amro</u>, 232 F.3d at 798. At the very least, sufficient evidence exists for a reasonable jury to find that Appellant was given lesser pay raises than similarly situated younger and Anglo employees. <u>Anderson</u>, 477 U.S. at 249; <u>Byers</u>, 150 F.3d at 1274.

As can be gathered from the above discussion, the evidence presented by Appellant involved complete comparisons involving her percentages of the total raises received by her younger and non-Hispanic peers during the relevant time period of 2003-2008. Appellant's evidence also involved similar comparisons of Hispanic versus non-Hispanics, and of younger versus less young similarly situated counterparts for the <u>entire</u> relevant time period.

---

received 74% of the average pay increase that her Anglo peers got over that period. [*App.* at 138, 146, 182-83; *App. of Contents Filed Under Seal* at 7-12].

Examining the data in this manner is the most complete and truth-revealing evaluation of the evidence because it involves comparisons not for one isolated year or another, but rather takes into account the data for the entire relevant six-year period. However, the District Court did <u>not</u> analyze whether such complete comparisons were sufficient evidence for a reasonable jury to issue a verdict in favor of the nonmoving party. [*App.* at 279-80; <u>Anderson</u>, 477 U.S. at 249; <u>Byers</u>, 150 F.3d at 1274].

Rather, in analyzing the evidence the Court decided to cherry-pick data from one year (2003) and then from another (2004), instead of evaluating numbers for the entire 2003-2008 period. [*App.* at 279-80]. In particular, the Court selectively stated that "in 2003 [Appellant] received a 2.6% raise, leaving her the highest paid member of her MTS peer group, [and that]…the highest raise that year was…awarded to a Hispanic male about eight years younger than [Appellant]…while the smallest raise…was awarded to a white male who was about five years younger than [Appellant]." [*App.* at 279]. The Court also added that in "2004 [Appellant] received a 2.5% raise [when]…raises among her peers were all between 0% and 3.7%,…[and that] [t]here were several white and younger employees who received smaller raises than [Appellant]." [*App.* at 279-80].

Without offering any analysis of the evidence for the years 2005, 2006, 2007 and 2008, the Court succinctly stated that "[t]he data reveals similar patterns in the

other years," and that "[t]his hardly supports an inference that any of [Appellant's] raises constituted an adverse employment action." [*App.* at 280].

Such selective evaluation of the data completely ignored comparisons involving Appellant's percentages of the total raises received by her younger and non-Hispanic peers during the entire relevant time period of 2003-2008. [*App.* at 279-80].  Also totally disregarded by the Court was Appellant's evidence involving the raise comparisons of Hispanic versus non-Hispanics, and of younger versus less young counterparts for the <u>entire</u> time period. [*Id.*].

Such examination of the evidence presented by the District Court not only ignores the majority of the relevant data, but clearly fails to examine all reasonable inferences therefrom in the light most favorable to the nonmoving party, as required by law. <u>Anderson</u>, 477 U.S. at 249; <u>Byers</u>, 150 F.3d at 1274.

The above-discussed evidence is more than sufficient for a reasonable jury to find that Appellant was treated less favorably than those similarly situated employees in the non-protected classes, particularly if the evidence is examined in the light most favorable to the nonmoving party, which the Court was required to do and did not do. <u>Id.</u>

## II.

## THE COURT ERRED WHEN IT DETERMINED THAT SANDIA'S REASONS FOR APPELLANT RECEIVING LESSER RAISES THAN THOSE RECEIVED BY SIMILARLY SITUATED YOUNGER AND NON-HISPANIC EMPLOYEES WERE NOT PRETEXTUAL.

In the Order, the Court concluded that Appellant "failed to come forward with evidence that Sandia's explanation of her [lesser] raises was mere pretext for age and race discrimination." [*App.* at 285]. However, for each reason alluded to by Sandia to try to explain Appellant's pattern of raises smaller than those of her younger and Anglo peers, Appellant offered evidence that supports an alternative version of the facts. Appellant's evidence was either completely ignored by the District Court or not examined, including all reasonable inferences therefrom, in the light most favorable to the nonmoving party.

    A.    The Court erred when it ignored evidence from which a reasonable jury could conclude that the "value of contribution" ratings given my Mr. Sandoval were determinative in establishing the salaries of Appellant and her peers.

The first legitimate, non-discriminatory reason offered by Sandia for Appellant's comparatively-lesser raises is that "the size of a Sandia employee's raise depends not only on her VOC rating, but also on her pre-evaluation salary, such that an employee who receives a high rating but is already earning above the peer group can usually expect a raise that is smaller than that awarded to a fellow employee who is also highly rated, yet who pre-evaluation salary is below average." [*App.* at 285]. The problem

with this reason is that the notion the "value of contribution" ("VOC") ratings assigned were only "one factor" but not determinative is refuted by the evidence.

In particular, in every single year from 2003 through 2008, the person that had the highest percentage raise also received, <u>without exception</u>, an OC, the highest "value of contribution" rating within the MTS group. [*App.* at 137, 150, 168; *App. of Contents Filed Under Seal* at 7-12]. The highest raises for each such years were: T.A. (8.2% in 2003); B.S. (3.7% in 2004); B.S. (5.6% in 2005); B.S. (15.3% in 2006); M.P. (3.3% in 2007); and J.L.E. (10.7% in 2008). [*App.* at 150; *Corrected Joint Appendix, Vol. II, Filed Under Seal* at 7-12].[5]

<u>All</u> of these persons receiving the highest raises received the highest rating (OC) without exception. [*App.* at 137, 150, 168; *App. of Contents Filed Under Seal* at 7-12]. Further, the recipient of the highest raises in the MTS peer group was an Anglo in 5 of the 6 years. [*App.* at 139, 150; *App. of Contents Filed Under Seal* at 7-12]. Also, said recipients were, on average, 45.7 years old, while during the same period Appellant was, on average, 55.7 years old; a whole decade older than those getting the best raises. [*Id.*].

Indeed, when Mr. Sandoval dropped Appellant's VOC ratings, such a drop in turn resulted in a steady drop in her salary increases. Specifically, Appellant's raises

_____

5 For privacy purposes, these individuals are identified by initials only. Their names are set forth in the Corrected Joint Appendix, Vol. II, Filed Under Seal.

since she joined MTS in 2000 but <u>before Mr. Sandoval became her manager</u> were: 4.27% in 2000; 5.00% in 2001; 5.19% in 2002; 2.61% in 2003. [*App.* at 137, 150, 159-81].  Then, her raises <u>after Mr. Sandoval became her manager</u> in 2004 were <u>all lower</u> than her lowest raise as an MTS from 2000 to 2003. [*App.* at 137-38, 150, 159-81; *App. of Contents Filed Under Seal* at 7-12]. Appellant's raises <u>during the Sandoval era</u> were as follows 2.5% in 2004; down to 1.6% in 2005; to 1.3% in 2006; and then slightly back up to 2.0% in 2007. [*App.* at 138, 159-67, 177-81; *App. of Contents Filed Under Seal* at 7-12].   Only after Mr. Sandoval ceased to be her manager did Appellant's raise bounce back to 6.2% in 2008, clearly a direct result of the fact that her new manager Roger Showalter rated her as OC in 2008. [*App.* at 137-38, 150, 159-81; *App. of Contents Filed Under Seal* at 7-12].  Mr. Sandoval's only explanation for this bounce back in Appellant's raise was: "I have no clue. Maybe market reference went up." [*App.* at 139, 159-67].

Therefore, a reasonable jury could find that the VOC ratings handed down by Mr. Sandoval from 2004 to 2007, were more than just "one factor" but determinative (or at least very important) in establishing Appellant's salary raises.   But when analyzing pretext, the Court completely ignored and did not discuss the evidence establishing that VOC ratings had a direct correlation to employee raises. [*App.* at 285-86].  Instead, the Court succinctly noted that "the [VOC] rating was only one factor in determining the raise…." [*App.* at 285].

If that was indeed the case, and VOCs were not "the" factor, why is it that in every single year from 2003 through 2008, the person that had the highest percentage raise also received, <u>without exception</u>, the highest VOC rating within the MTS group? [*App.* at 137, 150, 168; *App. of Contents Filed Under Seal* at 7-12]. In short, Sandia may have offered a legitimate explanation involving "pre-evaluation salaries" as being the reason for Appellant's comparatively lower raises. But Appellant presented sufficient evidence for a reasonable jury to be able to conclude that the explanation lies elsewhere, i.e.: in the VOC ratings that were handed out by an individual (Mr. Sandoval) that, as discussed below, possessed biases based on age and national origin.

The Court however, erred when it ignored Appellant's evidence of the determinative impact of VOC ratings. Accordingly, the Court failed to examine such pretext evidence, and all reasonable inferences therefrom, in the light most favorable to the nonmoving party, as required by law. <u>Anderson</u>, 477 U.S. at 249; <u>Byers</u>, 150 F.3d at 1274.

> B.    <u>The Court erred when it failed to examine evidence of age and national origin bias by Mr. Sandoval and all reasonable inferences therefrom in the light most favorable to the nonmoving party</u>.

The second legitimate, non-discriminatory reason offered by Sandia for Appellant's comparatively-lesser raises than those of her peers in the non-protected classes is that, according to Mr. Sandoval, "[h]er peers' work exceeded [Appellant's] work greatly." [*App.* at 139, 151, 159-67, 284]. However, an alternative explanation

was supported by the record.  There was substantial evidence of age and national origin bias that allowed a rational fact-finder to infer that such bias was the reason why Sandoval reduced Appellant's ratings (and thus her raises).  This evidence was a lot more than Appellant's "subjective beliefs" that she was treated unfairly.

For instance, sometime in 2003 or 2004, when MTSs had responsibility for both Material Control and Accountability ("MC&A") and Physical Security, Mr. Sandoval took out a list at a department meeting and started to state the names of a number of MTS employees that were eligible to retire. [*App.* at 139, 151, 159-67, 184-93]. Included in the names stated by Mr. Sandoval was that of Appellant. [*Id.*].  Appellant told Mr. Sandoval at the meeting that she wanted her name off the list. [*Id.*].  When questioned about why he started to list names of employees that were eligible to retire, Mr. Sandoval stated that "each year" he would do that because managers were asked by the higher-ups to talk to people about when they planned to retire. [*Id.*].

When discussing this evidence, the Court stated that this was not probative of bias because "Sandoval was required to ask these questions in order to offer any employee that might retire a salary benefit…." [*App.* at 285].

However, the Court mischaracterized the evidence by stating that Sandoval was just "asking questions" regarding who wanted to retire.  He was compiling a list and publicly mentioning those who could retire.  From this evidence alone, taken in the light most favorable to the non-movant, a reasonable inference can be made that Sandia

36

wanted people to retire, thus suggesting an institutional bias against those that are of retirement age.  Otherwise, why mention them publicly "every year"?

Nevertheless, even if Sandia's reason for compiling the "retirement list" is taken at face value, that does not explain why Mr. Sandoval repeatedly asked Nancy Morreale (one of his project leads) when Appellant was going to retire. [*App.* at 139, 151, 184-93].  Indeed, the Court did <u>not</u> discuss why Mr. Sandoval repeatedly asking another project lead when Appellant was going to retire did not reasonably suggest an "out with the old and in with the new" attitude on his part. [*App.* at 285].  If this evidence had been examined with all reasonable inferences therefrom in the light most favorable to Appellant, the Court should have concluded that it suggest an ageist bias by Sandoval and Sandia. <u>Anderson</u>, 477 U.S. at 249; <u>Byers</u>, 150 F.3d at 1274.

However, this was not the only conduct from which a jury could have reasonably inferred bias.  In 2005 or 2006, Mr. Sandoval stated, in the presence of Karen Sienkewich and of Appellant, that "I was in 2nd grade when Maggie came to work here." [*App.* at 140, 151, 169].  Sandoval's hostility toward Appellant was also displayed when he was told by Mr. Ashbaugh that Appellant was applying for a team lead position in 2008 to which Sandoval responded: "What does she want us to do, bake cookies." [*App.* at 140, 152, 159-67, 169, 184-93].

These comments were dismissed by the Court as "typical workplace banter or sarcasm that some may find unpleasant, but is not evidence of discrimination."  [*App.*

37

at 285-86]. Counsel for Appellant admits that these comments, without more, are perhaps insufficient under Tenth Circuit law to find discrimination. However, if this evidence is to be truly analyzed with all reasonable inferences in favor of the non-movant, then the probative value of such ageist comments must not be examined in a vacuum (as done by the Court), but rather in their proper context. If a reasonable jury were confronted with a factual scenario where the same person (age 42) that every year mentioned publicly to her peers that Appellant (age 60) was eligible for retirement was the same person who repeatedly asked another project lead when Appellant was going to retire, and was also the same person who commented to others that Appellant had been there "since [he] was in the 2nd grade" and who made nasty references regarding "baking cookies" for her; then, if all of this evidence is analyzed with all reasonable inferences in favor of Appellant, then a jury reasonably could (albeit not necessarily will, but could) find that Mr. Sandoval possessed an ageist bias.

However, there is further evidence that suggests ageism by Mr. Sandoval. Under Mr. Sandoval's management from 2004 through 2007, on average, 50 and over employees only received 67% of the average total pay increases enjoyed by similarly situated employees under 50. [*App.* at 140, 152, 182-83; *App. of Contents Filed Under Seal* at 7-12]. Moreover, from 2004 through 2007 Appellant's average pay increase amounted to only 61% of the average increases offered to similarly situated under-50 employees. [*App. contents filed under seal* at 7-12; *App.* at 138; 182-183]. This

38

evidence is particularly revealing when one considers that, as established above, a reasonable jury could conclude that the VOC ratings handed down by Mr. Sandoval during that period were determinative to the salaries of MTSs like Appellant. However, the Court completely ignored the above comparison evidence when determining whether Sandia's reasons were pretextual.

There is additional evidence of age and national origin-based bias. In August, 2004, a few months after Mr. Sandoval became her manager, Appellant had been part of the Human Reliability Program ("HRP") for over 17 years. [*App.* at 139, 151, 184-93]. She and another Hispanic (Larry Chavez) were suddenly removed from their HRP duties. [*Id.*]. Mr. Sandoval told Appellant at the time that her job duties had changed. [*Id.*]. As a result of said action, Appellant was removed from the HRP database, which in turn prevented her from having that resource in order to do her job. [*Id.*]. Starting in 2005, Appellant was not given new assignments from Mr. Sandoval and he limited the tools she needed to do her work. [*App.* at 139, 151, 184-93].

Mr. Sandoval also moved Appellant to an office where she "had no desk, had no file cabinet,…[and] did not have a red drop to be able to do classified work and did not have Entrust, which allows [one] to send e-mails outside Sandia, like to the site office." [*App.* at 140-41, 152, 159-67, 184-93; and see Knox v. Indiana, 93 F.3d 1327, 1334 (7th Cir. 1996) (adverse actions include "moving the person from a spacious, brightly

39

lit office to a dingy closet, depriving the person of previously available support services…or cutting off challenging assignments").

With respect to the above evidence, the Court ignored that it was not only Appellant, but another Hispanic (Larry Chavez) that were removed from the HRP database, which in turn prevented them from having that resource in order to do their jobs by Sandoval. [*App.* at 285-86]. Similarly, the Court alludes to the move to a new office by only mentioning that the new office had no desk, but completely ignored that the office given to Appellant by Mr. Sandoval also lacked a red drop to be able to do classified work and did not have Entrust, which allows one to send e-mails outside Sandia, like to the site office.

Mr. Sandoval, who is half-German, also tried to rotate Appellant out of the S&S Dept. [*App.* at 140, 159-67, 169, 184-93]. Mr. Sandoval also told Martin Carrasco, a Hispanic staff augmentation contractor who had a degree, that he could not get hired as a Sandian. [*Id.*]. By way of contrast, during the Sandoval era, two Anglos who had no degrees and who had been staff augmentation contractors (Tom Rodgers and Paul Keller), were hired as Sandians. [*Id.*]. With respect to this comparison evidence, the Court only noted that Appellant did not say who hired the two Anglo contractors without degrees. [*App.* at 286].

However, the Court misses the point. Mr. Sandoval had no problem with the placement of non-degreed outside contractors Mr. Rodgers and Mr. Kelly, but wanted

40

Appellant (a Hispanic) out of the S&S Dept., and told Martin Carrasco, another Hispanic but a contractor who had a degree, that he could not get hired at Sandia.

Additionally, Mr. Sandoval testified that Appellant (who was never disciplined in 42 years at Sandia) "helped make the team successful," but yet he was on an apparent mission to make her life difficult by telling her she had problems with the team. [*App.* at 140-41, 152, 159-67, 171, 184-93]. For instance, around 2005, he would come into Appellant's office, telling her that "so-and-so couldn't work with me, and then he'd come the next day and he'd say, well, so-and-so thinks that you're mad at them." [*Id.*].

Appellant admits that if each of the above facts regarding bias is taken separately and in isolation, then they are perhaps insufficient to find discrimination. However, if this evidence is to be truly analyzed with all reasonable inferences in favor of the non-movant, then the probative value of the evidence must not be examined in a vacuum (as done by the Court), but rather as a whole. If a reasonable jury were confronted with a factual scenario where the same person that ordered that Appellant and another Hispanic be removed from their HRP databases which they needed to do their jobs, also was the same supervisor who did not give Appellant any new assignments from 2005 through 2008, and who moved her to an office with no desk, no file cabinet, no red drop to be able to do classified work, no Entrust to be able to send e-mails outside Sandia, and that this same person (Mr. Sandoval) was the one that had no problem with

41

the placement of non-degreed outside contractors Mr. Rodgers and Mr. Kelly under him, but wanted Appellant (a Hispanic) out of the S&S Dept., and told Martin Carrasco, another Hispanic but a contractor who had a degree, that he could not get hired at Sandia, and that this same person was on an apparent mission to make her life difficult by telling her day in-day out that she had problems with the team even though he testified that Appellant "helped make the team successful;" then, if <u>all</u> of this evidence is analyzed with all reasonable inferences in favor of Appellant, a jury reasonably <u>could</u> (albeit not necessarily will but could) find that Mr. Sandoval possessed a national origin-based bias.

However, there is further evidence that suggests a national origin based bias by Mr. Sandoval.  Under Mr. Sandoval's management from 2004 through 2007, Hispanic employees only received 69% of the average total pay increases enjoyed by similarly situated Anglo employees. [*App.* at 140, 152, 182-83; *App. of Contents Filed Under Seal* at 7-12].  Moreover, from 2004 through 2007 Appellant's average pay increase amounted to only 61% of the average increases offered to similarly situated Anglo employees. [*App. contents filed under seal* at 7-12; *App.* at 138, 182-83].  This evidence is particularly probative when considering that a reasonable jury could conclude that the VOC ratings handed down by Sandoval during that period were determinative to the salaries of MTSs like Appellant.  However, the Court completely

ignored the above comparison evidence when determining whether Sandia's reasons were pretextual.

In addition to all of the discussed evidence, a rational inference could be drawn from the fact that, it was only after Appellant came under the management of Mr. Sandoval that Appellant's raises began to consistently drop.  As shown, Appellant's raises had been consistently higher since 2000 and then, without any performance or discipline issues whatsoever [*see App.* at 193], her raises consistently lessened after coming under a manager who engaged in discriminatory comments and questions, and who had a persistent "out with the old in with the new" attitude, and whose record included exclusion of Hispanics staff augs. and inclusion of Anglo staff augs.  The Court however failed to consider the propriety of this inference as well.

If the Court had considered the totality of the evidence in its proper context and as a whole, with all reasonable inferences in the light most favorable to Appellant, as it was required by law to do, it would have concluded that a reasonable jury could find that an age and national origin bias did contribute to Appellant's comparatively-lesser pay raises.

## III.

## THE COURT ERRED WHEN IT DETERMINED THAT SANDIA'S REASON FOR APPELLANT'S DUTIES BEING SIGNIFICANTLY REDUCED IN 2008 WAS NOT PRETEXTUAL.

Appellant's second basis for her claims of age and national origin discrimination is that in June, 2008, she was reassigned to a job with significantly lesser responsibilities and leadership duties. Prior to her reassignment in 2008, Appellant's scope of duties encompassed seven program areas and a total of 29 specific duties. [*App.* at 140, 154, 169].[6] After her reassignment, Appellant maintained only one program area (the VTR Program), which included only six duties. [*App.* at 141, 154, 169]. In other words, Appellant suffered a 79% loss of her responsibilities and/or duties. [*Id.*].

---

[6] Under "PS Planning", Appellant oversaw: (1) the SSR Program, (2) security reviews for new construction and remodels, (3) facility database, (4) SMA policy support, and (5) EM Program support. Under the "Security Area Program", she oversaw: (6) MBA plan review, (7) activations and deactivations, (8) area inspections, (9) barrier inspections, (10) facility inspections, and (11) remote site inspections. Under the "VTR Program", she oversaw: (12) review of new and updated plans for VTR/ISP, (13) activations and deactivations, (14) scheduled inspections, (15) configuration inspections, (16) mapping, and (17) codes. Under the "Controlled Articles Program", she oversaw (18) process requests. Under the "TLA Program", she oversaw: (19) review of new and updated plans, (20) activations and deactivations, and (21) inspections. Under the "Lock and Key Program", she oversaw: (22) process requests, (23) production, issue, and destruction of locks, keys, and cylinders, (24) installation and repair of padlocks, cylinders spin dial locks, (25) changing safe/vtr combination as required, (26) L&K inventories, (27) issuance of Manzano Codes, and (28) GSA container inspection. Under the "FNR Program", she oversaw the (29) review of FNR's. [*App.* at 169, 173-74].

Further, Appellant was the project lead that headed and streamlined the efforts of six employees. [*App.* at 141, 154, 171]. After her reassignment she had only one person under her, which involved an 83% loss in the amount of employees that she had under her. [*Id.*].

Interestingly, after Appellant's reassignment, several of her prior responsibilities, such as locking key responsibilities, SSR and TLAs, were entrusted to Tom Rodgers in an increased capacity. [*App.* at 141, 154, 189]. Mr. Rodgers is an Anglo employee who had previously been a staff augmentation non-Sandian contractor. [*Id.*].

In the Order, the Court concluded that Appellant had established a *prima facie* case of age and national origin discrimination on the basis of her 2008 reassignment to a job with significantly lesser responsibilities and leadership duties. [*App.* at 283].[7]

---

[7] The evidence alluded to in the first three paragraphs of Section III and in *fn* 5 above is contained in Appellant's affidavit attached as Ex. 2 to Appellant's Response to Motion for Summary Judgment. [*App.* at 168-74]. In the Order, the Court erroneously concluded that this affidavit was intended to create a sham factual issue that should be excluded from consideration. [*App.* at 280-82]. The Court based its conclusion on the notion that Appellant's was an affidavit that was "contrary" to or "conflict[ed]" with her own prior deposition testimony. [*App.* at 280-81].

However, the specific declarations in the affidavit do not "conflict with" or are "contrary to" the prior deposition testimony. [*App.* at 66-68, 168-74, 281]. The affidavit simply amplifies and presents detailed facts that Appellant was not specifically asked about in her deposition. [*Id.*]. Nevertheless, the Court erroneously held Appellant accountable for the fact that Sandia's counsel did not specifically ask about the detailed information offered in her affidavit. [*App.* at 280-82]. If Sandia

However, the Court erred when it determined that Sandia's reason for Appellant's duties being significantly reduced in 2008 was not pretextual.

The reason offered by Sandia for the decision to reassign Appellant to the VTR program in 2008 was that VTR was the "crown jewel" of physical security, and that Appellant's knowledge of VTRs made her a key leader in the VTR program. [*App.* at 284-85]. Once again, Appellant has put forth evidence that supports an alternative explanation that could rationally be found by a jury to be the real reason why Appellant was reassigned to VTR, namely:

Minutes from a reorganization meeting indicated that Mr. Sandoval stated (as part of Sandia's decision-making process on where to place Appellant) that the only work that Appellant did was VTR codes. [*App.* at 141, 156, 171]. Appellant told Scott Ashbaugh that Mr. Sandoval had sold her short on that issue, and Mr. Ashbaugh responded to her that Mr. Sandoval would not deny that he did. [*Id.*]. Thus, a reasonable jury could find, if they believe Appellant, that Appellant was assigned to VTR (with the significant reduction in responsibilities that that entailed) because Mr. Sandoval stated that it be that way. Now, Mr. Sandoval may refute that, but a jury

---

failed to ask Appellant about specific data at her deposition, Appellant had every right to bring up such additional information to refute summary judgment. In any event, the Court's afore-mentioned error was not prejudicial to Appellant because the Court held that, even without the affidavit, there was sufficient evidence to establish a *prima facie* case of age and national origin discrimination on the basis of her reassignment to a job with significantly lesser responsibilities and leadership duties. [*App.* at 283].

should have a chance to determine the truth. Thus, a <u>dispute of fact</u> clearly existed regarding whether Sandoval's directive is the reason that Appellant was assigned to VTR.

What makes this disputed fact material is that this is the same Mr. Sandoval for which there is substantial evidence of age and national origin bias that would allow a rational fact-finder to infer that such bias was the reason for his assignment of her to VTR. [*See* § II.B *supra.*].   In other words, as discussed in § II.B, there is ample evidence regarding Mr. Sandoval that allows a reasonable inference that Sandia's reason for reassigning Appellant to VTRs is pretextual.

The Court however, held that, even if Mr. Sandoval were deemed to be biased, the evidence establishing that Sandoval's remarks that "the only work that Appellant did was VTR codes" resulted in Appellant's duties being reduced exclusively to one program (VTR) was excludable hearsay. [*App.* at 286-87].   In so holding, the Court engaged in error.

A.   <u>The Court erred when it held that Sandoval's remarks that "the only work that Appellant did was VTR codes" was hearsay in disregard of Rule of Evidence 801(d)(2)(D).</u>

Federal Rule of Evidence 801(d)(2)(D) provides, in its pertinent part, that "[a] statement is not hearsay if—[t]he statement is offered against a party and is…a statement by the party's agent or servant concerning a matter within the scope of the

agency or employment, made during the existence of the relationship." [Fed.R.Evid. 801 (d)(2)(D)].

In the Tenth Circuit, "an employee's statements are…attributable to his employer as a party-opponent admission in an employment dispute [if] the employee was 'involved in the decision-making process affecting the employment action' at issue." Johnson v. Weld County, 594 F.3d 1202, 1209 (10th Cir. Colo. 2010); see also Jaramillo v. Colo. Judicial Dep't, 427 F.3d 1303, 1314 (10th Cir. 2005) (per curiam).

Similarly, in Fester v. Farmer Bros. Co., 49 Fed. Appx. 785, 796-797 (10th Cir. 2002), this Court noted that "[i]n order for [a party-employer's employee's] statement to qualify as a party admission,…[the employee] 'must have actually been involved in the decision to hire or fire the person bringing the discrimination charge.'"  In Fester, the employee's whose statement was at issue was a "division manager in charge of the Denver branch [who] led the investigation that resulted in [the plaintiff's] discharge." 49 Fed. Appx. at 796.  Since the employee that made the statement was also the same that notified the plaintiff of termination, the statement was clearly within the scope of his employment and was nonhearsay. Id.; see also Fischer v. Forestwood Co., 525 F.3d 972, 984 (10th Cir. 2008) (taped conversations constitute admissions of a party-opponent because they were made by president of company at the time of the conversations who was acting as an agent for the company and was making statements within the scope of his authority); Rainbow Travel Service v. Hilton Hotels Corp., 896

F.2d 1233, 1242 (10th Cir. 1990) (allowing testimony of some of the clients, who recited statements made by a shuttle bus driver employed by the hotel "because it was a statement by a party's agent concerning a matter within the scope of [the driver's] employment with the hotel."); and Abuan v. Level 3 Communs., Inc., 353 F.3d 1158, 1171-1172 (10th Cir. Colo. 2003) (a vice president's statements concerning his company's unethical treatment of a direct subordinate falls under Rule 801(d)(2)(D)).

In this case, Appellant submitted her affidavit where she expressed that she had seen minutes from a reorganization meeting where Mr. Sandoval had stated (as part of Sandia's decision-making process on where to place Appellant) that the only work that Appellant did was VTR codes. [*App.* at 171]. The Court erroneously held that the minutes were not in evidence and were thus hearsay. [*App.* at 274, 286-87].

However, the "VTR only" statement found in the minutes was made by Mr. Sandoval as part of "'the decision-making process affecting the employment action' at issue," and is thus admissible non-hearsay under Rule 801(d)(2)(D). [*See App.* at 171; and Johnson, 594 F.3d at 1209; Jaramillo, 427 F.3d at 1314].

Nevertheless, even if *arguendo* Sandoval's statement found in the minutes were deemed hearsay (which is denied), Scott Ashbaugh's statement to Appellant that Mr. Sandoval would agree that he (Sandoval) sold her short by stating that she only did VTR is admissible non-hearsay. [*App.* at 171].

This statement was made by Scott Ashbaugh, a Sandia employee who (as Sandia noted in its Undisputed Material Facts) was one of the four employees that "made the decision to assign [Appelllant] to handling VTRs." [*App.* at 38]. Therefore, because Ashbaugh's statement is a "statement…[made by an] employee…'involved in the decision-making process affecting the employment action' at issue" (Appellant's placement in exclusive VTR duties), said statement is admissible non-hearsay under Rule 801(d)(2)(D). <u>Johnson</u>, 594 F.3d at 1209; <u>Jaramillo</u>, 427 F.3d at 1314.

Moreover, Scott Ashbaugh's statement that Mr. Sandoval would agree that he (Sandoval) sold Appellant short by stating that she only did VTR could reasonably suffice for a jury to find that Mr. Sandoval did indeed make such a statement. [*App.* at 171]. Taking all reasonable inferences in favor of Appellant, a reasonable jury could (and probably would) conclude that the reason to reassign Appellant to VTR was <u>not</u> that VTR was the "crown jewel" of physical security, and due to Lucero's knowledge of VTRs; <u>but because</u> Mr. Sandoval indicated at a decision-making meeting that the only thing Appellant knew how to do was work with the VTR program. [*App.* at 284-85].

What makes such a statement by Mr. Sandoval material is that this is the same Sandoval for which there is substantial evidence of age and national origin bias that would allow a rational fact-finder to infer that such bias was the reason for Appellant's assignment to VTR. [*See* § II.B *supra*.]. Accordingly, contrary to the Court's holding,

50

there was ample evidence regarding Mr. Sandoval that allows a reasonable inference that Sandia's reason for reassigning Appellant exclusively to VTRs was pretextual.

## CONCLUSION

The Court should reverse and remand the January 3, 2011 Order with instructions to deny Defendant Sandia's Motion for Summary Judgment to allow Appellant to proceed to trial on the merits.

## REASONS FOR ORAL ARGUMENT

Magdelene Lucero respectfully requests oral argument. This appeal presents novel, complex issues which may be more completely addressed if the Court hears argument.

Respectfully submitted,

KELEHER & McLEOD, P.A.


By _____ */s/ Jeffrey A. Dahl* _____
    Jeffrey A. Dahl
    Javier F. Junco
    Post Office Box AA
    Albuquerque, NM  87103
    Telephone:  (505) 346-4646
    *Attorneys for Appellant*

**ATTACHMENT:**

**ORDER APPEALED FROM**

## <u>CERTIFICATE OF COMPLIANCE</u>

I **HEREBY CERTIFY** that this Corrected Plaintiff/Appellant's Opening Brief complies with the type-volume limitation imposed by Federal Rule of Appellate Procedure 32(a)(7)(B). The word count feature of the word processing system used to prepare the brief indicates a word count Twelve Thousand Four Hundred Ninety [12,490], excluding the corporate disclosure statement, table of contents, table of authorities, request for oral argument, certificate of service, and this certificate of compliance.

*/s/ Jeffrey A. Dahl*

Jeffrey A. Dahl
Javier F. Junco

Dated: April 18, 2011

## CERTIFICATE REGARDING
## ECF FILING

**I CERTIFY** that:

1.     All required privacy redactions have been made to this document;

2.     If additional hard copies of this document are required to be submitted, this document is an exact copy of the submitted hard copies; and

3f.     This ECF filing was scanned for viruses with the most recent version of a commercial virus scanning program, eTrust Threat Management Agent, last updated April 18, 2011, and, according to the program, is free of viruses.

KELEHER & McLEOD, P.A.

By:   */s/ Jeffrey A. Dahl*
     Jeffrey A. Dahl

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that an original and seven copies of Corrected

Plaintiff/Appellant's Opening Brief and two copies of the Corrected Appendix were

sent via Federal Express on April 18, 2011 to:

> Office of the Clerk
> United States Court of Appeals
> for the Tenth Circuit
> Byron White United States Courthouse
> 1823 Stout Street
> Denver, Colorado  80257

and that a copy of the Corrected Plaintiff/Appellant's Opening Brief and Corrected

Appendix were hand-delivered to:

> Aaron C. Viets
> Rodey Dickason Sloan Akin & Robb, P.A.
> P.O. Box 1888
> Albuquerque, NM 87103-1888

*/s/ Jeffrey A. Dahl*
Jeffrey A. Dahl
Javier F. Junco

0118411